**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GEORGE ROJAS, )
)
)
)
Plaintiff, ) Case. No. 09-C-5587
v. )
) Magistrate Judge
MICHAEL J. ASTRUE, ) Arlander Keys
Commissioner of Social )
Security )
Defendant. )

## MEMORANDUM OPINION AND ORDER

Plaintiff, George Rojas, moves this court for Summary Judgment, pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse or remand the final decision of the Commissioner of Social Security (the "Commissioner"), who denied his claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). 42 U.S. C. § 401 *et seq.* (West 2007). Defendant Commissioner has filed a Cross-Motion for Summary Judgment. For the reasons set forth below, the Court denies the Commissioner's Motion for Summary Judgment, and grants Mr. Rojas's Cross-Motion for Summary Judgment, in part, remanding the matter back to the Commissioner for further action consistent with this Opinion.

## FACTS AND PROCEDURAL HISTORY

George Rojas applied for SSI and DIB on January 10, 2006, while incarcerated, alleging that he became disabled on November 2, 2005, due to depression and panic attacks. R. at 97, 103, 111, 251. The Social Security Administration ("SSA") denied Mr. Rojas's claim initially and again upon reconsideration. R. at 71, 78, 254. Mr. Rojas subsequently requested a hearing before an Administrative Law Judge ("ALJ"), who held the requested hearing on April 3, 2008. R. 328-56. ALJ B. Carlton Bailey, Jr. issued a decision on November 4, 2008, denying Plaintiff's claim for benefits, and finding that Plaintiff was not disabled and could perform a significant number of jobs that existed in the economy. R. 26-36. The ALJ's decision became the final agency decision when the Appeals Council denied Plaintiff's Request for Review. *See* 20 C.F.R. § 416.1481.

Mr. Rojas filed this lawsuit on September 9, 2009, seeking review of the Agency's decision and an award of benefits. Compl. ¶ 1. The case was initially assigned to Judge Charles R. Norgle, in the Northern District of Illinois. On December 16, 2009, the parties consented to proceed before a magistrate judge, and the matter was reassigned to this Court. Thereafter, both parties moved for summary judgment. Mr. Rojas asks the Court to reverse the ALJ's decision and award benefits, or, in the alternative,

remand the case for further proceedings. The Commissioner has filed a cross-motion for summary judgment.

## Evidence Before the ALJ

### 1. Testimony at the Hearing

### A. Plaintiff's Testimony

At the time of the hearing, Plaintiff was 36 years old. R. at 278. Mr. Rojas lives in an apartment with his two children, ages 11 and 6, and his mother. R. at 279. His wife, who had recently left him, "comes in" two or three days each week. *Id.* Mr. Rojas receives food stamps and has a medical card, which helps pay for treatment and medications. He stated that he does not have a drivers' license, because, since his license expired, his condition prevents him from visiting a DMV facility[1]. R. at 280.

Mr. Rojas stopped attending school in the ninth grade. R. at 280. In 1993, Mr. Rojas moved to Mexico, because he was "running from the law." R. at 280. Despite his lack of education and his professed inability to speak Spanish[2], Mr. Rojas testified that he found employment as an English teacher in a Mexican technical school for six months. R. at 281. He purportedly left Mexico

---

[1] This conflicts with later testimony, where Mr. Rojas testified that his license was revoked in 1990 and that he had been unable to pay the $1500 to have it restored, and that this is why he was without a license. R. at 284.

[2] However, Dr. Langgut noted that Mr. Rojas spoke both English and Spanish fluently. R at 186.

3

shortly thereafter, because his wife had complications when giving birth to his son. R. at 281.

Between 1998 and 2005, Mr. Rojas sporadically worked as an assistant manager at a number of fast food restaurants, such as Burger King, McDonald's, Popeye's, and Taco Bell. R. at 282. Mr. Rojas's problems began when he "started getting incarcerated back in 1990." R at 282.

Mr. Rojas stated that he was in and out of an unidentified penitentiary between 1999 and 2004, and that, at some point in 2004, he was beaten badly by approximately 15 officers from the Chicago Police Department. R. at 283. When asked to describe the incident, Mr. Rojas explained that, after he fled from a traffic stop, a high speed chase ensued and he ultimately ran from his vehicle. R. at 291-92. He claims that between 10 and 20 officers tracked him down in an alley, where they beat him and forced him to ingest drugs. R at 292. The officers purportedly continued beating him at the police station, until he was taken to Christ Hospital. R. at 292-93.

Mr. Rojas returned to prison for retail theft in 2005. R. at 285. It was at this time that Mr. Rojas first complained about having difficulty interacting with groups. He claims that a psychiatrist later told him that the trauma of the beating impacted his ability to socialize with others. R. at 283.

Following this incarceration, Mr. Rojas worked as a painter, painting small interior spaces, such as offices. R. at 285-86. This job seemed ideal for Mr. Rojas, because he painted the offices when they were empty and relieved him of having to interact with others. However, he was easily distracted and it took him so long to complete his work, that the job offers dried up quickly. R. at 286.

Mr. Rojas has difficulty sleeping, even though his physician prescribed him medication to help him sleep. R. at 288. Typically, Mr. Rojas is unable to sleep at night, falling asleep at dawn, when he feels safe. Mr. Rojas suffers from headaches when he gets depressed, and takes Seroquel and Lorazepam, which make him drowsy. R. at 293

At the hearing, Mr. Rojas claimed that he stopped using illegal drugs in 1999. R. at 294. He explained that, although he admitted to an agency psychiatrist in 2006 that he used drugs in 2004, he was actually referring to the incident where the police officers forced the drugs into him. R. at 295. Mr. Rojas then admitted that he smoked marijuana while in county jail in 2005. R. at 296. In addition, records indicate that Mr. Rojas was using drugs on a daily basis before he was incarcerated on July 12, 2004. R. at 211, 297.

In terms of household chores, Mr. Rojas cooks dinner, and he sometimes helps with dishes. He refuses to do the laundry,

because it requires him to leave his apartment. R. at 288. He does not attend church or play outside with his children. R. at 289. Mr. Rojas testified that he has a difficult time socializing with others, even family members. He explained that, while he attended his sister's 40th birthday party, he merely wished her a happy birthday and spent the remainder of the party nearby at an outdoor fireplace. R. at 272. Plaintiff testified that he had gained 60 pounds, weighing in at 236 pounds, since his incarceration in January of 2006. R. at 279.

## B. Testimony of Vocational Expert Linda Gels

The ALJ asked VE Gels about a hypothetical individual who was the same age, and had the same work and educational back ground as Mr. Rojas. The VE explained that Mr. Rojas's past work as an assistant manager at a fast food restaurant was semi-skilled, performed at the medium exertional level, and that his work as a painter likely qualified as semi-skilled, performed at the medium exertional level as well.

The ALJ asked the VE about an individual with this background, who could sit, stand and walk six out of eight hours, who could frequently lift 30 to 40 pounds and who could occasionally lift 100 pounds, and who was moderately limited in his ability to understand, remember, and carry out detailed instructions; in his ability to maintain attention and concentration for extended periods; and in his ability to

interact with the general public.  The VE responded that such an individual could perform positions such as a hand packager, an order filler, or an assembler.  R. at 310.  If such an individual were also limited in his ability to work in coordination with others without being distracted by them, that individual could still perform positions such as a cleaner, housekeeper, or janitor.  If, however, that same individual was unable to maintain regular attendance and be punctual, there would be no jobs available to such an individual.  R. at 312.

Mr. Rojas's attorney then asked the VE whether this same hypothetical individual could perform these positions if he were moderately limited in the ability to complete a normal work day and week, without interruptions from psychologically-based influences, and needed an unreasonable number and length of rest periods.  The VE responded that individuals in unskilled positions, such as those described to the ALJ, are given minimal accommodations for such limitations.  R. at 312.  Mr. Rojas's attorney then asked whether that same individual could  perform the unskilled positions listed by the VE, if he were markedly limited in his ability to sustain work and work in coordination with others; and in his ability to interact with the general public.  The VE responded that the positions she had identified were fairly isolated and that the marked limitation would not change her answer.  R. at 314.

## 2. Medical Evidence

### A. Illinois Department of Corrections

A Prisoner Intake Mental Health Evaluation performed on July 12, 2004, states that Mr. Rojas presented with "a clear and stable mental status with no reported or observed complaints or distress," R. at 211, and that he did not require mental health services. Similarly, on August 9, 2004, a Mental Health Evaluation, which was completed after Mr. Rojas was placed in segregation, noted that he reported no psychological problems. R. at 212. These are consistent with a similar evaluation performed on June 27, 2005. R. at 213. However, on August 19, 2005, Mr. Rojas reported feelings of depression, and stated that he had problems sleeping at night. R. at 214. On October 22, 2005, Dr. Amin, of the Illinois Department of Corrections, recommended that Mr. Rojas take Prozac and begin individual and group therapy to treat his mild depression. R. at 216. By December of 2005, Offender Outpatient Progress Notes from the Vienna Correctional Center indicate that Mr. Rojas suffered from Major Depressive Disorder and that he required 50 mg of Trazodone. R. at 209.

### B. Dr. Langgut

Following his March 2, 2006 consultative examination of Mr. Rojas, Dr. Langgut indicated that Mr. Rojas arrived 20 minutes early for his appointment, traveled to the appointment on public

transportation with his son, that he was polite but anxious, and that he fluently spoke both English and Spanish. R. at 186. Dr. Langgut noted that Mr. Rojas cut off social contact with former friends and acquaintances in 1999, purportedly because he didn't want to go back to prison, and that Mr. Rojas is able to complete his activities of daily living. R. at 187. Mr. Rojas was socially withdrawn, had difficulty interacting with others, and mildly resented others. However, Mr. Rojas had a "somewhat high level of concretivity of thought"; intact judgment; average coherence; normal speed, flexibility, and suggestibility; and displayed no behavioral abnormalities. R. at 188. Ultimately, Dr. Langgut diagnosed Mr. Rojas with major depressive disorder, mild to moderate; social phobia; anxiety disorder, N.O.S.; and personality disorder, N.O.S. R. at 189.

## C. Greater Lawn Mental Health Center

Mr. Rojas submitted records from the Greater Lawn Mental Health Center, where he has sporadically sought treatment since February 10, 2006, ten days after his release from prison. In general, the records indicate that Mr. Rojas's mental condition improved or deteriorated over different periods, with his peaks and valleys often coinciding with whether he was taking his medication. In evaluating Mr. Rojas's Affective Disorders, Mr. Rojas is described as having depressive syndrome characterized by sleep disturbance and decreased energy. R. at 194. Mr. Rojas is

also described as having recurrent, severe panic attacks, manifested by sudden unpredictable feelings of fear or doom. R. at 196. A non-examining Consultant notes that Mr. Rojas suffers from substance abuse, major depressive disorder, NOS, social phobia, anxiety disorder, NOS, and antisocial personality disorder. R. at 203. However, the Consultant also opines that these disorders have only a mild degree of limitation on his activities of daily living, his ability to maintain social functioning and to maintain concentration, persistence or pace, R. at 202, and conclude that "[h]is mental condition is non-severe." R. at 203.

## D. Dr. Vincent Copp of Greater Lawn

Dr. Copp, a psychologist, diagnosed Mr. Rojas with major depressive disorder, post-traumatic stress, an anxiety state disorder, anti-social personality disorder, and assigned him a Global Assessment of Functioning ("GAF") score of 50. R. at 220. Dr. Copp opined that Mr. Rojas's symptoms-- including his inability to concentrate for even two hour segments, his inability to work in coordination with or proximity to others, and his inability to work at a consistent pace without excessive and unreasonably lengthy rest periods- rendered him unable to perform even unskilled work. R. at 222. Dr. Copp stated that Mr. Rojas had extreme or severe limitations in his ability to perform the activities of daily living and in maintaining social

10

functioning, and that he had frequent deficiencies in concentration, persistence, or pace, resulting in a failure to complete tasks in a timely manner. R. at 223. Significantly, the Record contains no underlying tests administered by Dr. Copp that would support his diagnosis.

## E. Dr. Schroeder of Greater Lawn

On June 1, 2006, Dr. Schroeder noted that Mr. Rojas suffers from paranoid disorder, social phobia, and sleep disturbance. According to Dr. Schroeder, a psychiatrist, Mr. Rojas's symptoms include suspiciousness, anxiety, intolerance of crowds, social isolation, ideas of reference, and delusion. Dr. Schroeder prescribed Mr. Rojas with Lorazepam and Seroquel. R. at 233-38. Dr. Schroeder's notes indicate that, when Mr. Rojas failed to show up for his monthly appointments and, therefore, failed to have his prescriptions refilled[3], his condition deteriorated. For example, Dr. Schroeder noted that, at Mr. Rojas's October 2006 visit, following a three month absence, Mr. Rojas "didn't want to wait to be seen." R. at 238. However, in September 2007, when Mr. Rojas was compliant with his appointments and medications, his symptoms improved enough to enable him to participate in his son's school and karate events. R. at 234.

---

[3] Mr. Rojas testified that Dr. Schroeder's office would fill his prescriptions even if he did not make his monthly appointment, but Dr. Schroeder's records indicate otherwise. R. at 232-39.

## 3.  Activities of Daily Living Report

In an Activities of Daily Living Report, completed on February 20, 2006, Mr. Rojas stated that he cleans, vacuums, makes beds, and cooks one to two times each day. R. at 133.  Mr. Rojas stated that he often plays cards and games and watches television; that he sometimes reads, watches his children, fixes things, engages in unidentified hobbies, and talks on the phone; and that he rarely drives, goes to church or to sporting events, volunteers, pay bills, goes out to eat, goes to movies or goes to school.  R. at 136.  He stated that, since approximately 1999, he began having difficulty concentrating, sleeping, and socializing with large groups.  R. at 134-35.  Mr. Rojas also complained of nightmares.  R. at 135.

### The ALJ'S Decision

The ALJ first determined that Mr. Rojas was not engaging in substantial gainful activity.  Next, the ALJ found Mr. Rojas to have severe personality disorder and associated residuals, and reported back pain with no objective support, but to have questionable credibility.  R. at 28-34.  The ALJ then determined that Mr. Rojas is moderately limited in his ability to understand, remember, and carry out detailed instructions; in his ability to maintain attention and concentration for extended periods of time; and in his ability to interact with the general public.  R. at 29-30.  The ALJ stated that Mr. Rojas could sit,

12

stand, and walk for 6 hours out of an 8 hour day, and he can lift
50 pounds occasionally and 30 to 40 pounds frequently.  R. at
30.  Although Mr. Rojas was not capable of performing any past
relevant work, the ALJ concluded that Mr. Rojas retained the
ability to perform medium work, including the jobs of a hand
packer, order filler, cleaner/housekeeper, and janitor.

In arriving at this conclusion, the ALJ rejected much of Mr.
Rojas's testimony regarding the limiting nature of his
impairments, finding that Mr. Rojas's testimony was incredible.
R. at 31.  The ALJ recounted Mr. Rojas's very forthcoming
testimony about his past criminal and drug abuse history,  R. at
31, but found that Mr. Rojas's stories simply went "too far" to
be believable, particularly his testimony that he tested positive
for drugs in 2004 after police officers forced him to ingest the
narcotics.  R. at 32.  The ALJ also found incredible Mr. Rojas's
claim that he both left school following the 8th grade and did not
speak Spanish, but was nevertheless able to secure a job as an
English teacher in Mexico.

The ALJ also rejected the opinion of Dr. Copp.  The ALJ took
issue with the attorney-generated form prepared by Dr. Copp,
wherein Dr. Copp reported that Mr. Rojas was extremely limited in
a number of areas, including the activities of daily living. R.
at 32-33.  The ALJ stated that, if Mr. Rojas were as disabled as
Dr. Copp indicated, Mr. Rojas "would be so dysfunctional that he

13

would be in an institution." R. at 33. The ALJ gave very specific examples of when Dr. Copp's report had gone "overboard", noting that if Mr. Rojas were, in fact, "extremely" limited in performing activities of daily living (as Dr. Copp's report indicates) Mr. Rojas would be unable to perform the activities that he admits he can perform (such as making dinner).

The ALJ also noted that the severity of Mr. Rojas's limitations, as described by Dr. Copp, vastly exceeded those found in other reports in the record and even Mr. Rojas's admissions. R. at 33. Specifically, the ALJ noted that psychiatric records from Mr. Rojas's incarceration indicated that his mental state ranged from "clear and stable", to suffering from sleep disturbances and paranoia, to then being oriented times three with no psychosis or instability. R. at 33. Dr. Copp's report was also contradicted by Dr. Langgut's assessment.

The ALJ relied heavily upon Dr. Langgut's finding that Mr. Rojas "had no indications of mania, his emotions were consistent with his thoughts and his activity level was normal; there were no behavioral abnormalities observed, there was evidence of intact memory skills, as well as intact computation skills; and thought processes were characterized by coherence and normal speed." R. at 29. The ALJ also noted that treatment notes made during Mr. Rojas's' confinement showed only mild depression, and concluded that Mr. Rojas is "alert and oriented . . . [t]houghts

14

are logical and organized . . . Mood and affect are within normal limits. . .. . He Does not present as psychotic or delusional . . . . No sign of instability." R. at 29, citing to R. at 181. As such, the ALJ concluded that the objective medical evidence did not support the degree of impairment alleged by Mr. Rojas. *Id.*

## STANDARD OF REVIEW

A district court reviewing an ALJ's decision must affirm if the decision is supported by substantial evidence and is free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla"; rather, it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In reviewing an ALJ's decision for substantial evidence, the Court may not "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007) (citing *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003)). Where conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the Commissioner, not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

An ALJ must articulate his analysis by building an accurate and logical bridge from the evidence to his conclusions, so that

15

the Court may afford the claimant meaningful review of the SSA's ultimate findings. *Steele*, 290 F.3d at 941. It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, or if the decision is not sufficiently articulated, so as to prevent meaningful review, the Court must remand. *Id.*

## SOCIAL SECURITY REGULATIONS

An individual claiming a need for DBI or SSI must prove that he or she has a disability under the terms of the SSA. In determining whether an individual is eligible for benefits, the social security regulations require a sequential five step analysis. First, the ALJ must determine if the claimant is currently employed; second, a determination must be made as to whether the claimant has a severe impairment; third, the ALJ must determine if the impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F.R. Part 404, Subpart P, Appendix 1; fourth, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"), and must evaluate whether the claimant can perform his or her past relevant work; and fifth, the ALJ must decide whether the claimant is capable of performing work in the national economy. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). At steps one through four, the claimant bears the burden of proof; at step five, the burden shifts to the Commissioner. *Id.*

16

## DISCUSSION

### I. The ALJ's Credibility Determination.

Mr. Rojas takes issue with the ALJ's determination that his testimony was not credible. Mr. Rojas essentially acknowledges that some of his testimony is "far reaching" and that the "ALJ may have been reasonable in discounting" at least some of his testimony. *See* Pl's Brief at 12. However, Mr. Rojas contends that the ALJ should have considered whether Mr. Rojas's testimony was simply a symptom of his personality disorder, instead of deeming him incredible. Mr. Rojas takes issue with the ALJ's comment that the Comprehensive Mental Health Assessment report documents Mr. Rojas's admission that he charmed and manipulated people and situations, explaining that the American Psychiatric Association's "Diagnostic & Statistical Manual of Mental Disorders" provides that persons with antisocial personality disorders often have an inflated self appraisal and may display a glib, superficial charm.

The Court fails to see how this bolsters Mr. Rojas's credibility. While it may support Mr. Rojas's claim that he suffers from a personality disorder, no one denies that he suffers from such a condition- the ALJ expressly found that Mr. Rojas suffers from a personality disorder in his decision. But the fact that Mr. Rojas's personality disorder might cause him to offer far reaching testimony, and manipulate people and

17

situations does not mean that he gets a pass for offering outlandish testimony. There is no precedent or law that requires an ALJ to overlook a claimant's unbelievable testimony when his compulsion to exaggerate may be caused by a mental impairment.

Mr. Rojas similarly argues that, even though his story about the police forcing him to ingest drugs sounds far fetched, it "should not greatly impact Plaintiff's ability to sustain work on a regular basis." Pl's Brief at 12. Of course, Mr. Rojas's argument misses the point; the ALJ did not find that Mr. Rojas's testimony impacted his ability to work, he found that it impacted-- detrimentally- Mr. Rojas's credibility.

Nor can the Court accept Mr. Rojas's argument that his testimony was consistent with the medical evidence in the record. While Mr. Rojas's testimony was supported by Dr. Copp's assessment, it would appear that Dr. Copp's assessment was based almost exclusively upon Mr. Rojas's own self-reported symptoms- the record is devoid of any objective testing performed by Dr. Copp that would support his diagnoses. In addition, as discussed below, the ALJ rejected Dr. Copp's opinions; as such, Dr. Copp's diagnoses do little to bolster Mr. Rojas's credibility. Conversely, other records support the ALJ's finding that Mr. Rojas's limitations were not as severe as Mr. Rojas claimed. For example, Dr. Schroeder's notes indicate that, when Mr. Rojas showed up for his appointments and took his medications, he was

functional, R. at 234, and records from Mr. Rojas's time in prison indicate only mild limitations.

Mr. Rojas also complains that the ALJ improperly found him incredible because of his prior bad acts. While Mr. Rojas's admitted criminal history is substantial, a fair reading of the ALJ's decision indicates that the ALJ based his credibility determination on the inconsistent and implausible nature of Mr. Rojas's testimony and not his criminal history.

Nor did the ALJ reject Mr. Rojas's testimony simply because he did not receive any mental health treatment prior to his incarceration in 2004. The ALJ discussed the fact that Mr. Rojas was incarcerated from 2004 until early 2006, and noted that his medical records showed only mild depression and no mental health complaints prior to that incarceration. The ALJ was correct to discuss Mr. Rojas's treatment records from his incarceration, as it coincided with his claim that his mental impairments were disabling as of November 1, 2005. The ALJ's discussion of Mr. Rojas's treatment records, and lack thereof, was both accurate and appropriate in this regard.

## II. The ALJ Should Have Contacted Dr. Copp

Plaintiff argues that the ALJ erred by rejecting the opinion of his treating physician, Dr. Copp. SSR 96-8p provides that "if a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the adjudicator must give it controlling weight."

Even if a treating physician's opinion is not entitled to controlling weight, it is still entitled to deference and the ALJ must weigh the physician's opinion using all of the factors provided in 20 C.F.R. § 404.1527. SSR 96-2p. While an ALJ is free to assign less weight to a treating physician's opinion, he must specify "the reasons for that weight." SSR 96-2p. An ALJ "may reject a treating physician's opinion outright only on the basis of contradictory medical evidence, and not due to his or her own credibility judgments, speculation or lay opinion." *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002)(reversing where the ALJ rejected a treating physician's assessment, because he felt that it signified "a certain advocacy posture"); *Clifford v. Apfel,* 227 F.3d 863, 870 (7th Cir. 2000). Instead, the ALJ must provide specific, legitimate reasons for rejecting the treating physician's findings. *Id.*

In the instant case, Dr. Copp– seemingly contrary to Dr. Schroeder, who works in the same practice-- opined that Mr. Rojas had extreme limitation of daily activities and social functioning; frequent difficulties with concentration, persistence or pace; and repeated (three of more) episodes of

decompensation in work or work-like settings. R. at 223. Dr. Copp also opined that Mr. Rojas had fair or poor/no abilities in every area of mental functioning that he was asked to evaluate. R. at 222. The Court agrees that the ALJ had reason to be skeptical of Dr. Copp's report based on the few times Dr. Copp had interacted with Mr. Rojas and the report of Dr. Schroeder, of the same medical practice.

The Commissioner[4] argues that the ALJ properly rejected Dr. Copp's report, because: 1) Dr. Copp's assessment of Mr. Rojas's condition went so far "overboard," that it contradicted even Mr. Rojas's admitted abilities, R. at 33; and 2) because it was contrary to other evidence in the record.

In discussing the exaggerated nature of Dr. Copp's report, the ALJ noted that, while Dr. Copp opined that Mr. Rojas was

---

[4] Initially, the Commissioner takes issue with both Plaintiff's characterization of Dr. Copp's title and the extent of his relationship with Plaintiff. Dr. Copp is not a psychiatrist, as Plaintiff claims, but is a licensed clinical psychologist. R at 223. Furthermore, Plaintiff saw Dr. Copp only three times: first, on March 13, 2006 for a Comprehensive Mental Health Assessment (or intake evaluation) and then again the following year on June 13 and July 7, 2007. R at 227-28, 240-47. A treating source is defined as the claimant's own physician or psychologist who has provided the claimant with medical treatment or evaluation, and who has had an ongoing relationship with the claimant. 20 C.R.R. § 416.902. A psychologist is not a treating source if the relationship "is not based on [the claimant's] need for treatment or evaluation, but solely on [the claimant's] need to obtain a report in support of [the claim] for disability." Id. Although Mr. Rojas's relationship with Dr. Copp was not long standing, it would appear that their relationship satisfies the regulation's very broad definition of a treating physician.

extremely limited in his ability to perform daily activities, Mr. Rojas's own admissions contradicted that assessment. Mr. Rojas indicated that he cleaned, vacuumed, made beds, cooked, washed dishes, engaged in hobbies, played cards and games, read, and watched television; a person with extreme limitations would be incapable of performing such activities. *See* 20 C.F.R. 404.1520a(c)(4) (noting that a person with extreme limitations lacks the ability "to do any gainful activity.") Dr. Copp's assessment in this regard was also contrary to Dr. Langgut's finding that Plaintiff was "able to complete his activities of daily living," R. at 187, and the Consultative Examination, which showed mental problems that were more than mild but not marked. R at 186.

The ALJ also noted that Dr. Copp reported that Mr. Rojas had "repeated", meaning three or more, episodes of decompensation in work or work-like settings, but the evidence indicated that Mr. Rojas had not encountered a work-like setting since the alleged onset of his disability on November 2, 2005- long before he met with Dr. Copp. R. at 97.

The Court agrees that the ALJ analyzed Dr. Copp's opinions pursuant to the factors set forth in 20 C.F.R. 404.1527(d) (ie., treatment relationship, supportability and consistency). The ALJ acknowledged that Dr. Copp was a treating source, but found that Dr. Copp's report was not supported by or consistent with the

evidence in the record. Similarly, although the ALJ criticized the attorney-generated form submitted by Dr. Copp, there is no indication that the ALJ improperly rejected Dr. Copp's opinions simply because he used the form. To the contrary, the ALJ's decision clearly enumerates the reasons the ALJ decided to discount Dr. Copp's opinions.

The only problem with the ALJ's decision is that he stated that Dr. Copp's use of the form indicates that he does not "understand the relationship of what he is doing within the parameters of Social Security Disability law." R. at 32. Similarly, at Mr. Rojas's hearing, the ALJ took issue with Dr. Copp's overzealous form responses, stating:

> I know what they're [sic] trying to do. They're trying to be helpful. They spend three or four minutes filling these out and they don't really understand our laws, rules and regulations. So what I do with these, counselor, is I accept them into the record and I give them weight where what they have said here is supported by their underlying treatment notes.

R. at 268. The ALJ went on to criticize Dr. Copp's attempts to mix medical opinions, which he is qualified to give, with vocational testimony, which he is not qualified to give. R. at 269. When the ALJ noted that he was unable to locate any underlying testing to support Dr. Copp's conclusions, such as a WAIS, a RAT, A WAIS-III, and suggested that Dr. Copp was simply guessing, Mr. Rojas's attorney admitted that Dr. Copp had apparently not conducted such testing. R. at 269.

23

The question becomes whether, in light of this, the ALJ was obligated to contact Dr. Copp for clarification, or whether he was correct in simply rejecting Dr. Copp's opinion for lack of underlying medical support and lack of support elsewhere in the record. Although this is an extremely close call, particularly in light of the ALJ's thorough analysis of Dr. Copp's form and the apparent lack of underlying testing supporting Dr. Copp's opinions, the Court agrees that the ALJ should have contacted Dr. Copp for clarification, and that his failure to do so requires the Court to remand this case for further proceedings. If the ALJ truly believed that Dr. Copp failed to grasp the import of his statements, or otherwise miscommunicated his diagnosis, the ALJ could have resolved any ambiguity by contacting Dr. Copp to clarify the basis for the statements made on the attorney-generated form. SSR 96-5p provides that "[f]or treating sources, the rules also require that we make every reasonable effort to recontact such sources for clarification when they provide opinions on issues reserved to the Commissioner and the bases for such opinions are not clear to us." *See also, Smolen v. Chater,* 80 F.3d 1273, 1288 (9th Cir. 1996) ("If the ALJ thought he needed to know the basis of [medical] opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example by subpoenaing the physicians or submitting further questions to them.")

Mr. Rojas also takes issue with the ALJ's failure to discuss Mr. Rojas's GAF score of 50. "Nowhere do the Social Security regulations or caselaw require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." Denton v. Astrue, 59 F.3d 419, 425 (7th Cir. 2010)(noting that the fact that the ALJ discussed the substance of the rating physician's report was sufficient). Upon remand, the ALJ is required only to thoroughly discuss Dr. Copp's assessment, and it is unnecessary to specifically analyze the GAF score assigned by Dr. Copp. *Id.*

Finally, Mr. Rojas argues that Dr. Copp's report was supported by Dr. Schroeder's findings. While Dr. Copp and Dr. Schroeder offer similar diagnoses, Dr. Copp's assessment of the severity of Mr. Rojas's illness and limitations would appear to exceed those noted by Dr. Schroeder. In addition, Dr. Schroeder's notes indicate that, when Mr. Rojas took his medication and kept his appointments, his condition improved, enabling him to attend his children's school and sporting events. R. at 234. A condition that is controlled by medication is not disabling. *Prochaska v. Barnhart,* 454 F.3d 731, 737 (7th Cir. 2006) (agreeing that, if a claimant's mental state improves with medication, the claimant is not entitled to benefits.)

The Court finds that the ALJ thoroughly reviewed Dr. Copp's opinions, and properly explained that he rejected those opinions

based about contradictory evidence in the record. As such, the Court cannot accept Mr. Rojas's claim that the ALJ's treatment of Dr. Copp's reports, at least in this regard, requires reversal or remand.

### III. The ALJ Did Not Play Doctor

Mr. Rojas contends that the ALJ crossed the line when discussing his condition. Specifically, the ALJ stated that:

> the claimant might be accused of logorrhea (excessive talking) except his thoughts were cogent and focused. The stories just went too far and I cannot find him to be a credible witness. While the term 'sociopath' is not used in the file, a personality disorder (NOS) is diagnosed and that is the correct impairment.

R. at 32. Mr. Rojas claims that, in so stating, the ALJ improperly rejected Dr. Copp's opinion in favor of his own unqualified lay opinion. *See Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("We have recognized that an ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so.) A review of the ALJ's decision in its entirety makes clear that the ALJ did not supplant his personal beliefs about Mr. Rojas's condition for that of Dr. Copp. The ALJ did not commit error by commenting on Mr. Rojas's rather lengthy testimony, and his statement that Mr. Rojas was diagnosed with a personality disorder is confirmed by the evidence in the record; Mr. Rojas was, in fact, diagnosed with personality disorder. The ALJ's statements do not require remand or reversal.

Mr. Rojas also claims that, once the ALJ rejected Dr. Copp's opinion, he necessarily played doctor, because there was no other medical evidence in the record to support his RFC finding. To the contrary, the ALJ specifically relied upon the findings of Dr. Langgut and Dr. Schroeder in arriving at Mr. Rojas's RFC. There is no indication that the ALJ improperly played doctor.

## CONCLUSION

For the reasons set forth above, the Court Denies the Commissioner's Motion for Summary Judgment, and Grants Plaintiff's Motion for Summary Judgment, in part, remanding the matter back to the Commissioner for further proceedings consistent with this Opinion. To be sure, the only fault that the Court can find in the ALJ's very careful analysis is his treatment of Dr. Copp's report, without attempting to contact him regarding that report. Upon remand, the ALJ may, but is not required to, grant Mr. Rojas another hearing.


Dated: November 19, 2010      E N T E R:




_____
ARLANDER KEYS
United States Magistrate Judge




27